SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Jamie SOLOW, Defendant.

Case No. 06–81041–CIV.

United States District Court, S.D. Florida.

May 14, 2008.

Jane M.E. Peterson, Securities & Exchange Commission, Washington, DC, for Plaintiff.

Jamie L. Solow, Boca Raton, FL, pro se.

Carl Francis Schoeppl, Jr., Schoeppl & Burke, P.A., Boca Raton, FL, for Defendant.

*ORDER*

DONALD M. MIDDLEBROOKS, District Judge.

This Cause comes before the Court on Plaintiff Securities and Exchange Commission's Motion for Remedies (DE 121). The Court has reviewed the record and is fully advised in the premises.

## I. Background

On November 8, 2006, Plaintiff Securities and Exchange Commission ("SEC") filed a Complaint against Defendant Jamie L. Solow, alleging violations of the federal securities laws within the Southern District of Florida.

The SEC alleged that Solow engaged in a fraudulent trading scheme by hiding the fact that he secretly purchased large forward settlement positions in risky and volatile inverse floating rate collateralized mortgage obligations ("inverse floaters"), putting his firm at risk without its knowledge or authorization, and thereafter causing false trade tickets to be submitted to further hide the fact that his transactions were not riskless principal transactions, as required by his firm. The SEC further alleged that Solow sold these complicated, volatile, and risky securities to retail investors for whom they were unsuitable. The SEC further alleged that, as a result of his fraudulent trading scheme, Solow aided and abetted Archer's violations of broker-dealer books and records, net capital, and reporting provisions.

On January 31, 2008, following a nine-day jury trial, the jury found that Defendant Solow had violated Section 10(b) [1] of

---

**1.** Section 10(b) of the Securities Exchange Act makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, to use or employ any manipulative or deceptive device or contrivance, in connection with the purchase or sale of any security, in violation of rules and regulations prescribed by the Securities and Exchange Commission for the public interest or for the protection of investors 15 U.S.C. § 78j(b).

the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b–5[2] thereunder [17 C.F.R. § 240.10b–5], and Section 17(a)[3] of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and had aided and abetted Archer Alexander Security Corp.'s ("Archer") violations of Section 17(a) of the Exchange Act and Rules 17a–3(a)(1), 17a–3(a)(2), 17a–3(a)(7) promulgated thereunder (the "Book and Record Rules"); Section 15(c)(3) of the Exchange Act and Rule 15c3–1 promulgated thereunder (the "Net Capital Rule"); and Section 17(a) of the Exchange Act and Rule 17a–5(a)(2) promulgated thereunder (the "FOCUS Report Rule").

On April 9, 2008, a hearing was held on the SEC's Motion for Remedies (DE 121). Following the hearing, the parties submitted additional briefing regarding certain issues. Those issues will be explored in the appropriate sections of this Order.

## II. Remedies

The SEC asks the Court to (1) permanently enjoin Solow from violating Section 10b and Rule 10b–5 thereunder; (2) permanently enjoin Solow from violating Section 17(a) of the Securities Act; (3) permanently enjoin Solow from aiding and abetting primary violations of Section 17(a) of the Exchange Act, Rules 17a–3(a)(1), 17a–3(a)(2), 17a–3(a)(7), and Rule 17a5(a)(2) thereunder, and from aiding and abetting primary violations of Section 15(c)(3) of the Exchange Act and Rule 15c3–1 thereunder; (4) order Solow to disgorge his ill-gotten gains from his violations of the antifraud provisions relating to his fraudulent and unauthorized trading while associated with Archer, totaling $2,646,485.99, as well as prejudgment interest thereon of $778,302.91; (5) order Solow to pay a third tier civil penalty equal to the amount of his unjust enrichment from his fraudulent and unauthorized trading at Archer, totaling $2,646,485.99; and (6) order Solow to pay third tier civil penalties of $130,000 for each of his violations of the antifraud provisions by making unsuitable sales of inverse floaters to the six retail customers who testified at trial or about whom significant evidence was introduced at trial.

### A. Injunctive Relief

■ The SEC moves the Court to permanently enjoin Solow from violating Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, violating Section 17(a) of the Securities Act, and aiding and abetting any violations of Section 17(a) of the Exchange

**2.** Rule 10b–5 provides that it is unlawful for any person to (a) employ any device, scheme, or artifice to defraud in connection with the purchase or sale of any security; (b) make an untrue' statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security; or (c) engage in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.

**3.** Section 17(a) of the Securities Act makes it unlawful for any person, in the offer or sale of any securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, to directly or indirectly (1) employ any device, scheme, or artifice to defraud, or (2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a).

Act and Rules 17a–3(a)(1), 17a–3(a)(2), 17a–3(a)(7) promulgated thereunder.

■ Section 21(d)(1) of the Exchange Act and Section 20(b) of the Securities Act authorize a district court to issue injunctive relief commanding that a person comply with the provisions of the Exchange Act, Securities Act, or the rules, regulations and orders thereunder. 15 U.S.C. § 78u(d)(1); 15 U.S.C. § 77t(b). Injunctive relief is appropriate where there is a reasonable likelihood that a wrong will be repeated. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir.2004). To make this determination, the Court considers several factors, including (1) the egregiousness of the defendant's actions, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations. *SEC v. Carriba Air*, 681 F.2d 1318, 1322 (11th Cir.1982) (citing *SEC v. Blatt*, 583 F.2d 1325, 1334 n. 29 (5th Cir.1978)).

Citing primarily Federal Rule of Civil Procedure 65(d)(1) and *SEC v. Smyth*, 420 F.3d 1225 (11th Cir.2005), Mr. Solow argues that the law of this Circuit prohibits the sort of broad "obey the law" injunction sought by the SEC. Although Mr. Solow concedes that the language in *Smyth* upon which he relies is *dicta*, he alternatively argues that, even if the sort of injunction sought here is permitted, the controlling law of this Circuit does not permit an "*overly broad and vague* 'obey-the-law'" injunction.

I previously addressed this issue in *SEC v. Converge Global, Inc.*, No. 04–80841, 2006 WL 907567, 2006 U.S. Dist. LEXIS 17581 (S.D.Fla. Mar. 10, 2006). In *Converge Global*, I noted that

[i]n the earlier case of *SEC v. Carriba*, 681 F.2d 1318 (11th Cir.1982), the Eleventh Circuit observed that the general rule against enjoining a crime was not ironclad, and exceptions could be made for public nuisances that were also crimes. 681 F.2d at 1321. The Court held that violations of the securities laws could be enjoined because such violations are analogous to public nuisances and because Congress had expressly provided the authorization to do so. *Id.* In fact in *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir.2004), the Eleventh Circuit found that it was clear error of judgment for the district court to fail to issue an injunction against future violations of the securities laws and regulations where every factor weighed in favor of an injunction. The Eleventh Circuit's recent *dicta* in *S.E.C. v. Smyth*, 420 F.3d 1225, 1233 n. 14 (11th Cir.2005), that enjoining against future violations of the securities laws constitutes an unenforceable "obey-the-law" injunction, does not compel a different conclusion. *See Ginsburg*, 362 F.3d at 1298 (where prior panel decisions conflict, the one first released is controlling)(internal citations omitted).

2006 WL 907567, at *4, 2006 U.S. Dist. LEXIS 17581, at *12–*13. Thus, as I have previously concluded, footnote 14 of *Smyth* is *dicta*, and Eleventh Circuit case law appears to permit the type of injunction the SEC seeks here. *See, e.g., Ginsburg*, 362 F.3d at 1305 (instructing the district court to enjoin the defendant from future violations of the securities laws and regulations); *CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir.1999) (holding that a district court did not abuse its discretion in permanently enjoining further violations of the Commodity Exchange Act). These types of injunctions have been utilized and upheld in other circuits, as well. *See, e.g., SEC v. Johnson*, 174 Fed.Appx. 111 (3d

Cir.2006); *SEC v. United Energy Partners, Inc.*, 88 Fed.Appx. 744 (5th Cir.2004); *SEC v. Keller Corp.*, 323 F.2d 397, 402 (7th Cir.1963); *Hillsborough Inv. Corp. v. SEC*, 276 F.2d 665, 667–68 (1st Cir.1960); *SEC v. Zwick*, 2007 WL 831812, 2007 U.S. Dist. LEXIS 19045 (S.D.N.Y. Mar. 16, 2007) (citing *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir.1972)); *SEC v. Poirier*, 140 F.Supp.2d 1033 (D.Ariz.2001).

The *Smyth dicta* is supported by considerable logical appeal. Enjoining a person so as to prevent him or her from violating the law, a command which every citizen is already bound to obey, seems to be an empty exercise. Nevertheless, it appears that the injunction the SEC seeks to have entered is permissible.

The United States Supreme Court previously examined this issue in a Fair Labor Standards Act case and determined that a decree enjoining any practices that were violations of those statutory provisions was valid. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Further, the Supreme Court stated that "[d]ecrees of such generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id.* The Supreme Court has also stated that a "federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941).

In this case, the requested injunction does more than require Mr. Solow to obey the federal securities laws. It tracks the statutory language of the sections Mr. Solow was found to have violated. This is permissible in this context and is neither an impermissible obey-the-law injunction nor an overly broad and vague injunction. *See Manor Nursing Centers Inc.*, 458 F.2d at 1103 (stating that "[t]here can be no abuse of discretion in framing an injunction in terms of the specific statutory provision which the court concludes has been violated"); *Keller Corp.*, 323 F.2d at 402 (upholding an injunction framed in terms of the statute and reasoning that a broad framework is particularly appropriate in an SEC enforcement action, which deals with the public interest and protecting investors from fraud and deceit).

■ Having considered the necessary factors, I find that there is a reasonable likelihood that Mr. Solow will again violate the securities laws. I base this finding on the degree of scienter involved given Solow's background and experience, the egregiousness of the conduct, Mr. Solow's failure to recognize the wrongful nature of his conduct, and, relatedly, the absence of any assurances against future violations. This is true whether the jury found Mr. Solow violated the securities laws by his actions at Archer Alexander, violated the securities laws by making unsuitable recommendations to investors, or both. Lastly, I find that Mr. Solow's occupation would present opportunities for future violations.

■ Therefore, I will enter the SEC's injunction. Further, because Mr. Solow's actions were blatant and brazen, a more extensive injunction is justified. *See CFTC v. Wilshire Inv. Mgmt. Corp.*, 407 F.Supp.2d 1304, 1313 (S.D.Fla.2005). Once the SEC has properly invoked the court's equity jurisdiction, "the court has power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir.1984). During the trial I saw Mr. Solow blame others for his failings, refuse to accept any responsibility for his own actions, and re-

peatedly testify falsely under oath. Based upon his demeanor and testimony at trial, and after watching his video presentation to investors and hearing the testimony of those individuals he enticed into risky investments through false promises, I conclude he should not be allowed to register as, or associate with a registered, broker-dealer or investment adviser.

## B. Disgorgement

The SEC originally requested disgorgement of Solow's "ill-gotten gains from his violations of the antifraud provisions relating to his fraudulent and unauthorized trading while associated with Archer Alexander, totaling $2,652,262.89, as well as prejudgment thereon of $780,106.68." In its supplemental briefing following the hearing on remedies, the SEC stated that its original calculation of Solow's commissions on the FHR 2582 XS bond was overstated by approximately $7,000. The corrected figure is $181,721.72, plus prejudgment interest of $55,206.92, for a total of $242,928.64. Consequently, the SEC requests that the Court order Solow to pay disgorgement for the Archer fraud of $2,646,485.99, plus prejudgment interest of $778,302.91, for a total of $3,424,788.90.

Mr. Solow argues that any disgorgement should be offset by: 1) the amount Solow paid in settlement of the Archer Alexander arbitration; 2) the value of the Solow Accounts retained by Archer Alexander to offset the loss it sustained on the FHR 2693 Inverse Floater; and 3) the amount of the commissions Solow paid to other brokers.

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains. The burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation. Exactitude is not a requirement; so long as the measure of disgorgement is reasonable,

any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir.2004) (internal quotations and citations omitted). A district court "may not disgorge profits obtained without the aid of any wrongdoing." *CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir.1999).

The SEC argues that the fact that the jury found that Mr. Solow aided and abetted Archer Alexander's primary violations of books and records, net capital, and reporting provisions is clear evidence that the jury found Mr. Solow liable for his conduct at Archer Alexander. Specifically, the SEC argues that the jury's finding on these claims demonstrates that its finding of antifraud violations did include Mr. Solow's conduct while at Archer, because the collateral books and records, net capital, and financial reporting violations arose out of the fraud against Archer. Therefore, the SEC contends, its disgorgement calculation of $2,646,485.99, which includes the commissions Archer paid to Solow for his unauthorized trades, plus prejudgment interest thereon of $778,302.91, is the correct measure of Solow's unjust enrichment.

The SEC arrives at this amount by taking the net markup on Mr. Solow's dealer to dealer trades as reflected in trade tickets and summaries prepared by Madeline Kronrad that were introduced into the record at trial, and calculating the 95% payout on those net markups that was made to Mr. Solow. To calculate the disgorgement amount on bonds that were purchased without authorization or an offsetting sale and then sold to retail customers, the SEC took the net markups on those trades as reflected in the trade blotters prepared by Madeline Kronrad that were introduced into the record at trial, and calculated the 90% payout that was made to Mr. Solow. For both categories, the SEC states that it

"conservatively calculated prejudgment interest for the period of December 31, 2003 through January 31, 2008, the date of the jury's verdict."

Mr. Solow argues that the SEC cannot demonstrate a causal connection between Mr. Solow's fraudulent trading at Archer and its disgorgement calculation, since it is not clear whether the jury found Mr. Solow liable for any violation arising from his conduct at Archer Alexander. Further, as a factual matter, Mr. Solow states that the SEC recognizes that Mr. Solow "paid some portion of the commissions" to others and that Mr. Solow paid a substantial amount to Archer Alexander as a result of the arbitration proceedings resolving Archer Alexander's contractual claims against him. Specifically, Mr. Solow cites to the trial testimony of John Raydo and states that Archer received $497,000 from Mr. Solow as a result of arbitration.

 The Court agrees that the SEC can show a causal connection between the disgorgement amount and the jury's finding that Solow violated the securities laws. The SEC seeks disgorgement only of the amounts Solow was paid for his unauthorized trades at Archer during 2003. The SEC's theory of Solow's aiding and abetting violations of Archer's primary violations of the books and records, net capital, and financial reporting violations was that Mr. Solow engaged in fraudulent, unauthorized trading while at Archer, which caused Archer to violate the collateral books and records, net capital, and financial reporting violations. In finding Mr. Solow liable for aiding and abetting, the jury necessarily had to find that Mr. Solow knowingly and substantially assisted in the primary violation. Thus, there is a causal nexus between the disgorgement amount and the jury's verdict of liability against

Mr. Solow, and the equitable remedy of disgorgement is appropriate.

 The Court will not reduce the disgorgement amount by the $497,000 payment Mr. Solow made to Archer relating to its arbitration claim against him. That payment was made for the loss Archer suffered on the trade of the FHR 2693 Inverse Floater. At oral argument, the SEC explained that Solow received no commissions for the FHR 2693 AS bond, and that bond was not part of the disgorgement number presented by the Commission. Therefore, because the $497,000 was never included in the disgorgement calculation, there is no need to deduct the $497,000 figure.[4]

 In his supplemental brief, Mr. Solow additionally argues that he already paid substantial sums to Archer Alexander, including $695,475.87 held in accounts owned by him that were retained by Archer Alexander to cover the loss on the FHR 2693 Inverse Floater. Thus, Mr. Solow argues, the disgorgement figure should be reduced by $695,475.87. The SEC acknowledges that a bond in Mr. Solow's personal account worth approximately $695,000 was liquidated in December 2003 to help satisfy Archer's loss on the FHR 2693 AS. However, as was the case for the amount paid in the Archer Alexander arbitration settlement, Mr. Solow received no commissions for this bond and it was not a part of the disgorgement number the SEC calculated. Therefore, the Court will not reduce the disgorgement figure by the value of the Solow accounts retained by Archer Alexander to offset the loss it sustained on the FHR 2693 AS bond.

 Finally, Mr. Solow argues that the disgorgement amount should be offset by commissions Solow paid to other brokers.

---

**4.** According to Mr. Solow's supplemental brief, the Archer Alexander arbitration proceeding settlement was actually for $495,000. This does not affect the Court's analysis.

Specifically, Mr. Solow argues, in his supplemental brief, that the disgorgement calculation for the Bond FHR 2582 XS improperly includes commissions paid to Webberly in the amount of $13,686.09 and Tatton in the amount of $6,874.03. Both parties acknowledge the possibility that Mr. Solow did pay such commissions to other brokers. However, once the SEC has made a reasonable approximation of ill-gotten gains, the burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation, with the risk of uncertainty falling on the defendant. *Calvo*, 378 F.3d at 1217.

Here, Mr. Solow has failed to offer sufficient evidence that he is entitled to offsets in the amounts he claims were commissions paid to Webberly and Tatton. The SEC has established a reasonable disgorgement total, and all doubts as to the size of the disgorgement must be resolved against the defendant. Thus, the Court exercises its discretion and declines to offset the disgorgement total on this basis.[5] *See SEC v. United Monetary Services, Inc.*, 1990 WL 91812, at *9 (May 18, 1990) (finding that the defendant did not meet his burden and was "not entitled to any offset or reduction in the amount of disgorgement for the expenses or conducting the fraud, such as commissions to salesmen or printing costs," and stating that courts have routinely required wrongdoers in securities fraud to disgorge the gross sums received).

### C. Civil Monetary Penalty

The SEC asks the Court to impose a civil money penalty against Mr. Solow pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d) ] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3) ].

The amount of a civil monetary penalty the Court may order to be paid is divided into three tiers based on the nature of the violation, whether the defendant is a natural or other person, and in light of the facts and circumstances of the violation. 15 U.S.C. § 77t(d)(2)(A)-(C); 15 U.S.C. § 78u(d)(3)(A)-(C).

Here, the SEC seeks third-tier penalties, which may total up to $130,000 [6] per violation by a natural person, or the gross amount of pecuniary gain to the defendant as a result of the violation, where:

(1) the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

(2) the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

*Id.*

Any civil penalty is to be determined by the Court "in light of the facts and circumstances" of the particular case. 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(I). Factors courts have considered include the egregiousness of the violation, the isolated or repeated nature of the violations, the

---

**5.** Mr. Solow cites to several district court cases from the Second Circuit, in which the courts offset the disgorgement amount by expenses incurred by defendant including commissions. However, even those courts acknowledged that the decision of whether to offset commissions and other expenses paid lies within the district court's discretion. *See, e.g., SEC v. Thomas James Associates, Inc.*, 738 F.Supp. 88, 95 (W.D.N.Y.1990) (stating that a court *may* consider as an offset the expenses incurred by the defendant and acknowledging that there may be situations in which disgorgement is properly ordered in the amount of the total gross profits).

**6.** The statutory figure of $100,000 per violation is adjusted for inflation to $130,000 per violation for violations occurring after February 14, 2005. 17 C.F.R. § 201.1003 & tbl. III.

degree of scienter involved, whether the defendant concealed his trading; and the deterrent effect given the defendant's financial worth. *SEC v. Sargent*, 329 F.3d 34, 42 (1st Cir.2003); *S.E.C. v. Yun*, 148 F.Supp.2d 1287, 1295 (M.D.Fla.2001).

In this case, the SEC requests that this Court impose a penalty equal to Mr. Solow's illicit profits from his unauthorized trading at Archer, totaling $2,646,485.99,[7] as well as a maximum third tier penalty of $130,000 for each of the six retail customers who testified at trial to whom Solow sold unsuitable investments, totaling $780,000.

In opposition, Mr. Solow argues that, because there were no special interrogatories and the jury responded to only a general verdict form, there can be no means of ascertaining the grounds for liability, and, as such, there can be no imposition of a third tier penalty pursuant to Section 20(d) of the Securities Act, because Solow may have been found liable for mere negligence pursuant to Section 17(a)(2) or (3). Negligence is an insufficient basis on which to impose third tier penalties.

This argument is unpersuasive. The verdict form asked the jury to determine separately whether Defendant Solow violated Section 17(a)(1), Section 17(a)(2), and/or 17(a)(3). Thus, it is clear from the verdict form that the jury found that Mr. Solow violated Section 10(b) and Rule 10b–5, as well as Section 17(a)(1). Accordingly, the jury found that Mr. Solow engaged in activity that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii).

■ Mr. Solow further argues that there is not a sufficient evidentiary basis for a civil penalty imposed pursuant to Section 21(d)(3) of the Exchange Act,

since, given the general verdict form, the jury could have found Mr. Solow liable for only one aspect of the multiple frauds alleged by the SEC.

Given the jury's findings, and this Court's examination of the facts and circumstances of the case, it is clear that third tier civil penalties are appropriate, imposed pursuant to both Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

As explained in the analysis of the disgorgement issue, the jury found that Mr. Solow violated the federal securities laws by, at the least, his conduct towards Archer Alexander. The facts and the circumstances of the case, as presented at trial, warrant the imposition of a penalty in the amount of Mr. Solow's gross pecuniary gain from his unauthorized trading at Archer, totaling $2,646,485.99. The Court makes this finding in light of the egregiousness of the violations alleged, the degree of scienter involved, the repeated concealment of his trades and the alteration of the dates of the transactions, and the deterrent effect given Mr. Solow's financial worth.

■ Prior to the hearing on remedies, the Court was inclined to deny the SEC's request for an additional civil penalty in the amount of $780,000, arrived at by multiplying the statutory $130,000 per violation amount by the six retail customers who testified at trial regarding the alleged unsuitable investments Mr. Solow made on their behalf. The jury returned a general verdict form, which was submitted to the Court by the SEC. Mr. Solow objected to the general verdict form and requested that a more detailed verdict form with special interrogatories be submitted to the jury. The SEC held fast to its desire to submit the general verdict form to the

7. This is the revised amount, as provided by the SEC in its supplemental brief.

jury, and the Court acceded to their request. The result of that request was that the fraud theory on which the jury found Mr. Solow liable was not explicitly stated on the verdict form.

In its supplemental brief, the SEC has pointed to a Seventh Circuit case, in which that court explained that

> [t]he judge is bound by the issues necessarily decided by the jury, and, therefore, the jury's determination often affects the judge's disposition of [an] accompanying equitable claim. However, when the basis of the jury's verdict is unclear, each of the potential theories supporting the verdict is open to contention unless this uncertainty be removed by extrinsic evidence showing the precise point involved and determined. Therefore, when several issues have been litigated, and the jury may have supported its verdict by finding in the plaintiffs favor on any one of the issues but which one is not clear, the court is free to determine the basis of the jury's verdict unless extrinsic evidence clearly resolves the issue.

*Miles v. Indiana*, 387 F.3d 591, 598 (7th Cir.2004) (internal citations omitted).

Thus, there appears to be some authority for the Court to impose an additional civil penalty in the amount of $780,000 on Mr. Solow. In this case, the testifying investors consistently recounted misrepresentations by Mr. Solow as to the safety of the illiquid inverse floaters he encouraged them to purchase. As noted above, Mr. Solow's contrary testimony was blatantly false. I believe the jury's verdict encompasses the unsuitable sales of investments to the individual investors, particularly with the absence of any extrinsic evidence inconsistent with such a finding. *See id.*

 However, the Seventh Circuit provides very limited explanation for its holding. Moreover, at least in the criminal context, the Eleventh Circuit has expressed some concern about a district court theorizing about the jury's views when the jury returns a general verdict form. *See, e.g., United States v. Hamaker*, 455 F.3d 1316, 1337 (11th Cir.2006). A civil case also involves constitutional concerns. In a civil case, the Seventh Amendment provides that, "in Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." A civil penalty has been held to be legal, as opposed to equitable, in nature. *Tull v. United States*, 481 U.S. 412, 422, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir.2002). Accordingly, it was Mr. Solow's constitutional right to have a jury determine his liability, with this Court thereafter determining the amount of penalty, if any. *See Tull*, 481 U.S. at 427, 107 S.Ct. 1831. Where the right to a jury trial exists, a court may not treat a jury verdict as advisory. *See Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518, 1526 (11th Cir.1991) (rejecting district court's alternative holding that characterized a jury verdict as advisory).

Therefore, while the Seventh Circuit appears to authorize this Court to make a determination that the jury found Mr. Solow liable for both his activities at Archer Alexander and for his dealings with unsuitable investments for his retail customers, I will resolve this uncertainty in favor of the defendant. Accordingly, I will not impose the additional $780,000 civil penalty the SEC requests. However, it is the Court's belief, and I would find, as stated above, that the jury found Mr. Solow liable for both theories of fraud. Some of the SEC's strongest evidence was the testimony of the retail customers, who repeatedly testified that Mr. Solow made misrepresentations about the safety of the inverse floaters.

### III. Conclusion

Having considered the violation and the totality of the circumstances of this case, the Court shall permanently enjoin Mr. Solow from violating the securities laws; enjoin him from attempting to register as, or associating with, a registered broker-dealer or investment adviser; order Solow to disgorge the amount of $2,646,485.99 plus prejudgment interest thereon in the amount of $778,302.91; and impose a third tier civil penalty in the amount of $2,646,485.99 to be paid by Solow.

Accordingly, it is hereby

ORDERED AND ADJUDGED that Plaintiff Securities and Exchange Commission's Motion for Remedies (DE 121) is GRANTED as provided herein. A Final Judgment shall issue separately.